WILLIAM J. MAJOR v. ALBERT M. TODD.

84    85
89    237

84    85
124   591

*Partnership—Dissolution—Accounting—Compensation for services.*

1. Where the term of a partnership is for an indefinite period, it may be dissolved at the will of either party; citing *Buck v. Smith*, 29 Mich. 166; *Solomon v. Kirkwood*, 55 Id. 256; *Walker v. Whipple*, 58 Id. 476.

2. Where one partner holds exclusive possession of the partnership property, and wrongfully refuses to let in the other partner, he will be accountable in a court of equity to such partner for his share of the profits made, which accounting will cover the time during which the partnership assets are used in making them.

3. In the absence of an express stipulation to that effect, a partner is not entitled to compensation for his services in and about the partnership business. *Heath v. Waters*, 40 Mich. 457; *Loomis v. Armstrong*, 49 Id. 525.

Appeal from St. Joseph. (Loveridge, J.) Argued October 30 and 31, 1890. Decided December 24, 1890.

Bill to dissolve partnership and for an accounting. Defendant appeals from a decree granting the relief prayed. Decree affirmed. The facts are stated in the opinion.

*Stewart & Meacham* and *Dallas Boudeman,* for complainant.

*Howard & Roos,* for defendant.

LONG, J. Complainant files his bill for the dissolution of a partnership and for an accounting. Decree was entered in the court below in favor of complainant as prayed in the bill. In the decree, the court made certain findings of fact, which are controverted here, and, as these findings relate to the principal questions raised in this Court, we insert the substance of such findings. It was found—

"1. That the said complainant and defendant are copartners in the carrying on of the business of harvesting, storing, and selling ice at Nottawa, St. Joseph Co., Mich., and have been copartners since on or about the 13th day of December, A. D. 1883.

"2. That, as copartners, the said parties on or about the 13th day of December, 1883, became and were the owners of that certain property, premises, and business described as follows: [Here describing the real estate;] also the railroad side track adjacent to said lands; also certain large ice-houses situated thereon, together with a large quanity of ice therein, and together with a quantity of tools, machinery, and lumber belonging to the ice business; and also a street called 'Railroad Street,' situated between Wallace and South streets, and that part of Williams street lying west of Nottawa street,—all lying and being in the village of Nottawa, St. Joseph county, Mich., and also were joint owners, as copartners, in the business of gathering, storing, and marketing ice on said premises and at Nottawa at and since the time last above mentioned.

"3. That the purported deed of conveyance, alleged to have been made by the complainant and wife to defendant, of the date of the 3d of January, A. D. 1889, and recorded in the office of the register of deeds for said St. Joseph county in Liber 86 of Deeds, page 68, purporting to be a quitclaim of the complainant's right, title, and interest in the property and business above mentioned, was never delivered to the defendant." This deed is

declared to be void and of no effect, and is set aside, and the title to the property purported to be conveyed thereunder decreed to stand in the complainant as if no such deed had ever been made and placed on record.

" 4. That said copartnership existing between the parties to this suit has never been dissolved, but that defendant, since about the 3d day of January, 1889, has excluded complainant from the business of 'said copartnership, and has operated said copartnership in his own name, receiving all the profits thereof, and that there never has been any accounting between the said copartners as to said copartnership business."

The decree orders an account to be taken before a circuit court commissioner of St. Joseph county, and a report made thereon to the court. This accounting is to commence with the beginning of the partnership on December 13, 1883, and extend up to the close of the examination before the commissioner, including the years 1889 and 1890.

The claim by the defendant on the hearing in the court below was, and that claim is made here,—

1. That there never was any partnership between the parties.

2. That, if there was, it was wound up by the deed of January 3, 1889, which defendant insists was delivered, and operated to wind up the partnership affairs, and that at the time of such dissolution all the affairs of the partnership were settled, and therefore no accounting can be decreed.

3. That, if any partnership ever existed, it was an indefinite and uncertain one, and for an indefinite time, and that either partner could dissolve it at will; that defendant did dissolve the same on January 2, 1889, and, if any accounting can be had, it can only be up to January 2, 1889.

The claim made by the bill is that on December 13, 1883, the defendant was the owner of the property hereinbefore mentioned, and was then engaged in the gathering, storing, and shipping of ice; that defendant then proposed to sell to complainant a half interest in said

business, and represented that he had made considerable money out of the business, and, if complainant would purchase one-half interest therein, large profits would be made; that, believing the representations so made, complainant purchased the one-half interest, paying the sum of $9,000 therefor, and received from the defendant a transfer of an undivided half interest in the business and property; that immediately after such transfer the parties entered into a copartnership for the purpose of carrying on the business, each to have one-half of the profits, and to be liable for one-half of the losses; that the defendant was to have the personal management of the business; that it commenced on December 13, 1883, and continued under the firm name of the Crystal Lake Ice Company, and that such copartnership has never been dissolved, and no settlement ever had; that defendant has continued to manage the business according to the arrangement made between the parties, sold large quantities of ice, and received large sums of money; that he has failed to render any account of profits or losses to the complainant, although often requested to do so, and that he has applied to his own use the funds of the partnership.

It is also alleged that about January 1, 1889, negotiations were entered into between the parties for a sale by the complainant to the defendant of complainant's interest in said business and property, and in contemplation that the negotiations would be carried forward, and for the purpose of being ready to close up the same, complainant had drawn up, signed, and acknowledged by himself and wife a quitclaim deed from himself and wife to defendant of all their interest in said property, with the expectation that the parties would meet and adjust the copartnership matters, but that the said sale was never completed, and no transfer ever made, but, while the said negotiations were going on, the defendant fraud-

ulently obtained possession of said deed, and caused the same to be recorded; that, after defendant had surreptitiously taken the deed and recorded the same, he executed to the National Bank of Sturgis a mortgage on said copartnership property for the sum of $6,000, which mortgage was recorded in the office of the register of deeds of St. Joseph county, and constitutes a cloud upon the title of the complainant to the property; that complainant is now desirous of dissolving the partnership, and he prays for an accounting. The bill also prays that the defendant be required to remove the mortgage to the National Bank of Sturgis, and that the deed from complainant to defendant be set aside, and that a receiver be appointed.

Defendant, by his answer, claims that on the sale of the property to the complainant the agreed price was $9,250, the payments being made by three notes of $2,000 each, and one of $1,922.50, said last note being the balance of such purchase price, less the amount due the complainant as principal and interest on a certain note for $1,200 which he then held against defendant; that he took charge of the business, and managed it, without any definite arrangement as to the amount of compensation he should receive, which he alleges was worth several hundred dollars per year; that, owing to unfavorable seasons, the business was not profitable; and that the receipts from the business were not equal to the cash disbursements made by the defendant. It is claimed by the answer that the notes so given by the complainant were not paid; that he had discounted the most of them at the bank, and had renewed them at complainant's request, from year to year, taking other notes from complainant for interest, when, on December 14, 1888, complainant again came to him, and asked for still another extension, which defendant refused, the indebtedness

then amounting to $11,000, principal and interest; that complainant then gave to defendant a detailed statement of his resources and liabilities, as an inducement to have defendant again indorse for him, and from which statement it appeared that complainant was worth the sum of $25,000 over and above all liabilities; that defendant thereupon, at the request of the complainant, paid for him at the bank $1,403.67, taking his note therefor, but declined to indorse or sign with him in renewal of his indebtedness to said bank for the $6,000 principal yet unpaid of said original indebtedness; that upon maturity thereof complainant was notified by the bank to pay the same, but he neglected so to do, and instead thereof shifted and transferred his property and assets for the purpose of placing them beyond the reach of execution; that on January 7, 1889, the bank brought suit on the notes for $6,000 against complainant and defendant, and, on April 9 following, obtained judgment against them thereon, amounting to $6,554.16 and costs of suit, upon which judgment execution afterwards issued, and was levied upon a large amount of defendant's property, and also a portion of that which complainant is alleged to have fraudulently transferred; that, in order to save his property so levied upon from sale on execution, defendant was obliged to, and did, pay from his own individual funds the amount of said judgment and costs, and now has pending in the circuit court of said county in chancery a creditors' bill against said complainant and others, to whom he is alleged to have fraudulently conveyed his assets, to discover property out of which to pay defendant the moneys so paid by him on said judgment.

Defendant further shows by his answer that, while complainant originally agreed to pay $9,250 for the one-half of said property, he has not yet paid sufficient even to reimburse defendant for the actual cash defendant has

paid for accumulated interest, and complainant is at the present time indebted to defendant in an amount greater than that of the original purchase price of said property. Defendant further says that, said complainant having failed to do as he originally agreed, and defendant desiring no longer to continue in business relations with him, on January 2, 1889, he offered to complainant his choice of two propositions,—either that defendant would sell to complainant defendant's one-half interest in said property and business for $1,500 cash, or that defendant would give complainant $2,000 for his interest therein, or, if complainant declined so to do, either defendant would lease this interest or accept a mortgage as security on the property. On the next day thereafter, complainant stated that he would accept defendant's proposition to sell his said interest at $2,000, and for that amount would convey the interest to defendant; and thereupon complainant and defendant agreed upon the terms of said sale, and complainant executed and delivered to defendant a good, sufficient, and valid conveyance of all complainant's interest in said business and the property, and defendant paid the agreed price of $2,000, and thereupon the *partnership* between complainant and defendant was dissolved, and their partnership relations wholly ceased, and since which time complainant has had no interest in said business or property. Defendant denies that he took said deed surreptitiously from the complainant, as alleged in the bill, or that any fraud was practiced in procuring it. Defendant also denies that he used any of said funds in his private business, and says that, with regard to placing the mortgage upon the property to the bank, it was only because of the injury to his business by the failure of the complainant to pay his indebtedness that he was obliged to place an incumbrance upon his property.

Defendant further alleges that, after purchase of complainant's half interest, he went to work repairing the machinery and buildings at large expense, and expended large sums of money in filling the buildings with ice, and that all the business was done in his individual name, help was advertised for in his name, and, though he was so engaged for a long time in filling the ice-houses and making repairs, complainant never appeared, nor made any objections, and gave no directions, and took no interest therein, nor did he offer to furnish any funds, or to be in any way responsible for the same; that the season of 1888 and 1889 happened to be a good year for those engaged in the ice business, and it was only after defendant had succeeded in gathering a crop that it occurred to complainant to claim a half interest in the business, and a repudiation of the sale of his interest to defendant.

The testimony in the case was taken in open court. Even if the testimony failed to contradict and disprove defendant's first claim, the answer put in by him would be sufficient. That there was a partnership between the parties is conclusively shown. It is admitted in very plain and unequivocal terms by the answer, in which it is alleged—

"That thereupon the partnership between complainant and defendant was dissolved, and their partnership relations wholly ceased, and since which time complainant has had no interest in said property or business."

Aside from this admission in the answer,—which would of itself, under the allegations in the bill, be sufficient for the court to find the existence of a partnership,—we are satisfied that the court below was right in finding from the testimony that the partnership commenced between the parties on or about December 13, 1883. This partnership has never been dissolved by any act of the

parties, unless the deed was made and delivered as claimed by defendant, and operated as a dissolution of the partnership relations. No accounting was ever had, and no such claim is made by the proofs. The deed purports to convey all the interest of the complainant to Mr. Todd in the property and business, and, if delivered as claimed, would undoubtedly have wound up the partnership affairs, and under Mr. Todd's testimony would have amounted to a full and final settlement of their partnership business.

Was the deed delivered as claimed by defendant? The complainant contends that it was not. He alleges that it was not, in his bill, and gave testimony on the trial to support that allegation. The defendant answers that the deed was voluntarily delivered, and he testifies upon the hearing in support of statements, in his answer. The burden is upon the complainant to substantiate the truth of his statement. The deed is in defendant's possession, and has been placed upon record, and *prima facie* was voluntarily delivered to him. Mr. Todd testifies that he made a proposition to Mr. Major on January 2, 1889, to take $1,500 for his interest in the property and business, or to give $2,000 to Mr. Major; that Major accepted the last proposition, and agreed to take up his note of $1,400 which Todd held, and the balance to be adjusted when they adjusted other matters, and whatever might be then coming Todd was to pay. On the next day the parties met in the law office of Stewart & Meacham. The deed was there, but not signed by Mrs. Major. Mr. Todd insisted that Mrs. Major should sign the deed, when Mr. Stewart directed Meacham to go. out and have Mrs. Major execute it, which was done. Mr. Todd then testifies as follows:

"I looked at it to see that it was all right, placed it in my pocket, and sat there for a few minutes talking

about the adjustment of the accounts and other matters on the final settlement of the balance of the $2,000. I said: 'Mr. Major, jump into your buggy, and go down and look over the books, and close up the matters, as you agreed to.' Mr. Stewart said: 'Why can't you bring your books and settle the whole matter here?' I said: 'This is not the place to settle it. If you wish to come to my office with Mr. Major, come.' I said to Mr. Major: 'Won't you come down after dinner?' He said: 'No; I can't.' Mr. Stewart said: 'You had better give me back the deed until you and Major get your matters settled.' I said: 'Not by any means. Mr. Stewart, you know as well as I do the critical condition of matters. Everything with the exception of this ice property has been mortgaged and levied upon. You are well aware that on that account I am extremely anxious to put this matter in shape as soon as I can.' I said: 'I am going to record that deed."

Defendant further testified that he gave the $1,400 note over to Stewart, and that he put it in his pocket, and he has never seen it since. Defendant went immediately and recorded the deed. There were only four parties in the office at that time, Mr. Stewart, Mr. Meacham, and the parties to the controversy. Mr. Stewart was called as a witness by complainant; and his attention being directed to the deed, and whether it was delivered, he stated, substantially:

"As I recollect it, Mr. Major agreed that he would sell his interest in that property and business for $2,000. Mr. Todd said that this note [the $1,400 signed by Major] was in Wolf's Bank; that he would get the note; that there was a little difference between them on their accounts in the ice business, which would not exceed $150,—the half, of course, would be for Mr. Major to pay,—and the balance in cash would be between five and six hundred dollars, which he would pay. Mr. Major said he would sell on those terms. * * * Mr. Meacham went over, and got Mrs. Major to sign and acknowledge the deed. Mr. Meacham and Mr. Major came in. Mr. Todd was there. Mr. Meacham laid the deed on the table in front of me. Mr. Todd was standing by

the side of the table. He reached his hand in his pocket, took the note out and threw it on the table, and took up the deed. I said: 'Hold on, Mr. Todd; that deed has not been delivered.' He said: 'That is all right; that is all right.' I said: 'No, it isn't all right.' He went to the stairs, and went part way down. I told him to come back, and I guess Mr. Major did too, but I don't recollect what Mr. Major did. I told him to come back, that he had stolen the deed from my table, and that I didn't allow people to steal deeds from me. He said it was all right, and I said it wasn't, and he came back into the office, and I said: 'Here, Mr. Todd, is that note you put on the table, and I want you to take that and deliver back that deed. You haven't paid the consideration, and I want you to understand that if you record that deed it is Major's deed.' As he started out, I said: 'Mr. Todd, I want you to understand that this entire trade is now off, and the whole thing is at an end, and you can't have the property.' He took the deed with him, but it was never delivered to him. I offered the note back to him, and told him to give back the deed which he had taken from the table; and then in his presence I told Mr. Meacham to take the note, and hold it for Mr. Todd. The note has never been in Mr. Major's possession. It is held by Mr. Meacham for Mr. Todd."

Mr. Meacham was called as a witness for the complainant, and corroborates the testimony of Mr. Stewart as to what took place in the office. This is also corroborated by the complainant, each testifying that the deed was not delivered, and Mr. Todd was told that he must not take the deed away. It is contended by counsel for defendant that this testimony and the surrounding circumstances show a delivery of the deed. We are not able to view it in that light. It is very doubtful indeed if the testimony of the defendant, when connected with the attendant circumstances, makes out the delivery as claimed. The argument is that, inasmuch as no steps were taken for a period of five months thereafter to set the deed aside, and in the mean time the defendant had gone on with the business himself, and made good profits,

complainant ought not now to be permitted to share in
the profits thus made. It is also said that the complain-
ant now seeks to take advantage of the situation, and be
placed in a position to share in profits thus made, but
that, if the defendant had thereafter sustained losses, no
such claim would have been made. While, as we have
already said, the burden is upon the complainant to show
that the deed was not voluntarily delivered, and that the
defendant took it away surreptitiously, we are satisfied
that the complainant has shown that the deed was not
voluntarily delivered, not only by the testimony of these
three witnesses, but the circumstances and the defend-
ant's own testimony point strongly to the conclusion that
the defendant at the time of taking the deed away was
aware that it was not surrendered to him by Major with
intent to have it take effect as a conveyance of all
Major's interest in the property and business. The court
below was therefore right in finding that there was no
delivery of the deed, and consequently the partnership
was not thus wound up.

It is contended, however, by the learned counsel for
the defendant that, though the deed was not delivered
so as to operate as a conveyance of the complainant's
interest in the property and business, yet their partner-
ship, if one ever existed, was for an indefinite period,
and that a partnership indefinite as to time can be
terminated at the will of either partner. It is not
claimed by the bill, and there is no testimony contained
in the record showing, that the partnership between the
parties was to continue for any definite time. Counsel
are right in the proposition that such a partnership may
be dissolved at the will of either party. That question
has been settled in this State. *Buck v. Smith,* 29 Mich.
166; *Solomon v. Kirkwood,* 55 Id. 256; *Walker v. Whipple,*
58 Id. 476. After the deed was recorded, the defendant

carried on the business in his own name, and excluded
the complainant from all control over it, or having any
voice in its management.    He advertised for men and
teams to work, in his individual name, and refused to
recognize the complainant's rights therein.    By this
means the partnership was dissolved. This fact, however,
did not make him the sole owner of the property.   He
expended large sums of money, and it is not claimed but
that he made large profits during the following winter.
In doing this, he used all the available means of the
partnership; its realty, as well as the tools and machinery.
He had also taken to himself the good-will of the busi-
ness, and to the utter exclusion of the complainant.   It
was out of these things, and the moneys advanced by
him, that the profits were made.

It is contended by defendant's counsel that after the
complainant was excluded from the business, which act
worked a dissolution, the defendant could not be com-
pelled to account for profits.    The argument is that Major
furnished nothing, and took no risks, and would not have
been liable for one-half of the losses, if there had been any;
that, therefore, all that the complainant can claim on an ac-
counting is the fair rental value of the one-half interest in
partnership assets which were used by Todd in making
the profits.    Counsel for defendant conclude their argu-
ment by remarking that, if the deed was delivered, that
ends the case.    If it was not delivered, the complainant
is entitled to an accounting as partner only to January
2, 1889, and as a tenant in common of the property
since; that is, for reasonable rent, less repairs.   The
decree provides for an accounting after January 2, 1889,
as well as before; and in this it is contended the court
below was in error.   Counsel refer us to Lindl. Partn.
(2 Amer. ed.) 467, where it is said that the doctrine of

laches is of great importance where persons have agreed to become partners, and one of them has unfairly left the other to do all the work, and then, there being a profit, comes forward, and claims a share of it. In such cases as these, the plaintiff's conduct lays him open to the remark that nothing would have been heard of him had the joint adventure ended in loss, instead of gain; and the court will not aid those who can be shown to have remained quiet in the hope of being able to evade responsibility in case of loss, but of being able to claim a share of gain in case of ultimate success.

But that is not this case. It appears that the defendant not only surreptitiously took the deed away, and claimed to own the whole of the business and property, but that, when the work was being commenced and being carried on, Mr. Major called upon the defendant, and proffered assistance, and was told by defendant that he would not talk with him about it. Complainant, if his testimony is true, called upon the defendant three times, and his rights were each time denied. He testifies that he had teams idle at the time, and would have put them to work in the business. This is not the case of one remaining idle, leaving the other to do all the work, and then coming forward to claim a share of the profits. He was insisting that he was a partner, and claiming his rights as such; and I know of no rule of law or equity which should preclude him from having an accounting for profits after January 2, 1889, as well as prior thereto. Of course, whatever moneys the defendant has put into the business to carry it forward must be taken into the account, as well as the indebtedness of the complainant to him which grew out of the purchase of the property in the partnership venture, as the complainant must also do equity. It is well settled that where one partner

holds exclusive possession of the partnership property, and wrongfully refuses to let in the other partner, he will be accountable in a court of equity to such partner for his share of the profits made. *Adams v. Kable*, 6 B. Mon. 384. So long as the partnership assets are used to make the profits, so long must such profits be accounted for. *Crawshay v. Collins*, 15 Ves. 218; *Washburn v. Goodman*, 17 Pick. 519; *Brown's Appeal*, 89 Penn. St. 139.

Claim is also made that, the defendant having taken full charge of the affairs and business of the partnership, he is entitled to compensation for such services. There is no claim that any such agreement existed between the parties. The general rule is that, though each partner is bound to bestow his services and labor with diligence and skill, he is not entitled to any reward or compensation, unless there be an express stipulation between the partners for that purpose. *Anderson v. Taylor*, 2 Ired. Eq. 420; *Bradford v. Kimberly*, 3 Johns. Ch. 433. There are no circumstances shown in the present case which would entitle the defendant to compensation for such service, in the absence of such agreement.

The decree of the court below must be affirmed, with costs. The cause will be remanded to the court below for the purpose of the account being taken in accordance with this opinion.

CHAMPLIN, C. J., CAHILL and GRANT, JJ., concurred.

MORSE, J. I do not think there should be any accounting after the filing of complainant's bill.